DECISION
Before this Court are consolidated appeals brought by Appellant Ronald Genereux (Appellant or Genereux). The instant matters arise out of a proposed development (Proposed Development) of a new 12,900 square foot CVS Pharmacy with drive-thru in the City *Page 3 
of Woonsocket (City or Woonsocket). Genereux seeks (1) reversal of the Woonsocket Zoning Board of Review sitting as the Board of Appeal's (Board of Appeal) affirmation of the Woonsocket Planning Board's (Planning Board) denial of his motion to dismiss based on administrative finality and approval of CVS's second master plan application; (2) invalidation of the Woonsocket City Council's (City Council) amendment to the Zoning Ordinance of the City of Woonsocket (Zoning Ordinance) changing the zone from R-2 to MU-1; (3) reversal of the Woonsocket Zoning Board of Review's (Zoning Board) decision to grant CVS's dimensional variances for the Proposed Development; and (4) reversal of the Board of Appeal's affirmation of the Planning Board's decision to approve CVS's Preliminary Plan application.
 I Facts and Travel Master Plan Approval
In 2008, CVS filed a Major Subdivision/Major Land Development Application with the Woonsocket Planning Board wherein it formally submitted the specifications for the Proposed Development. Pursuant to G.L. 1956 §§ 45-23-39(b) and 45-23-40 of the Rhode Island Land Development and Subdivision Review Enabling Act of 1992 (Development Review Act), CVS submitted its original master plan application (Master Plan I Application) to Jane Talbot (Talbot), Woonsocket's City Planner, for review and approval by the Planning Board.[1]See City of Woonsocket Subdivision and Land Development Regulations §§ 6.1-6.2. Following a hearing on December 10, 2008, the Planning Board denied CVS's application. The Planning Board's decision stated in pertinent part:
 "The Planning Board finds that: *Page 4 
 "1. The proposed development is not consistent with the City of Woonsocket Comprehensive Plan and therefore cannot be approved. The application is denied because the proposed development does not satisfactorily achieve a residential scale and character as is envisioned for properties in the MU-1 zone and specifically along Mendon Road." See December 10, 2008 Planning Board Decision at 7.
Following the denial, Joel Matthews (Matthews), Woonsocket's Planning and Development Director, wrote a letter to CVS outlining his recommendations for revisions to the project and held discussions with officials from CVS and their design and legal consultants. Id.
Subsequently, CVS submitted a new master plan application (Master Plan II Application). The Master Plan II Application specifies that CVS's Proposed Development "is located at the northwest corner of Mendon Road and Cass Avenue." See October 6, 2009 Administrative Officer Report to the Planning Board at 1. As described by Talbot in her report, [2] the site of the Proposed Development
 "is comprised of a parking lot for Kay's Restaurant (which sits across the street), a one-story convenience store with a gravel lot to its rear, two residentially zoned house lots and a portion of a third residentially zoned house lot. The total site acreage equals 98,934 square feet and has significant frontage along both Cass Avenue and Mendon Road, both of which are public streets. The site is currently zoned both MU-1 (Mixed-use Commercial/Residential) and R-2 (Low-density Single-family Residential)." Id.
Specifically, Master Plan II Application proposed
 "the development of a new CVS Pharmacy and an expanded area for the Kay's parking lot. Parcel A would contain 77,496 square feet of land and would contain the proposed new 12,900-square-foot CVS store with drive-through window. Access to Parcel A would be from either Mendon Road or from Cass Avenue. Parcel B would contain 21,438 square feet of land and would contain the *Page 5 
parking lot for Kay's. Access to Parcel B would be from either Dana Street or from Cass Avenue. The Cass Avenue driveway is proposed to serve both lots and is intended to reduce the amount of curb cuts along the roadway. The remainder parcel to the north is 63,901 square feet in area and includes an existing medical office with residential unit above." Id.
In the fall of 2009, public informational hearings were held in connection with CVS's Master Plan II Application. On October 6, 2009, Genereux requested that the Planning Board dismiss the Master Plan II Application based on the doctrine of administrative finality. See October 6, 2010 Planning Board Meeting Minutes. After hearing Genereux's motion, the Planning Board voted to temporarily table the matter until it had heard CVS's new application. Id. at 4.
Having tabled Genereux's motion, the Planning Board heard testimony from CVS's witnesses. David Hogue (Hogue), a civil engineer with Bryant Associates, testified regarding the site plan layout, parking spaces, grading/retaining walls, location of dumpsters, Kay's parking lot, curb cuts, drainage, utility plan, and truck access. Id. at 5-8. According to Hogue, from a site design and civil engineering standpoint, the Proposed Development was well designed to: (1) fit in with the natural conditions of the area; (2) protect the health, safety, and welfare of the community; (3) promote high quality and appropriate design and construction; (4) mitigate any land use impact; (5) provide safer access to the parcels; (6) improve the curb cuts; and (7) reduce the amount of runoff that would be entering the infiltration system. Id.
at 8-9.
When asked about the differences between the two master plan applications, Hogue testified that CVS modified the site plan in response to concerns from the Planning Board. Id. at 9. In particular, the Proposed Development was made "more user-friendly" by: (1) replacing the sidewalk along Mendon Road and Cass Avenue; (2) making handicap accessible ramps available; (3) adding sidewalks connecting Cass Avenue to the sidewalk in front of the store; (4) *Page 6 
incorporating a sidewalk along the Mendon Road driveway connecting to the main sidewalk; (5) significantly increasing landscaping along the back areas and along the residential neighborhood to mitigate the noise and accommodate concerns from residential abutters; and (6) upgrading the landscaping plan to accommodate concerns raised by the residential abutters. Id.
Diane Soule (Soule), an expert witness in the field of landscape architecture, explained that CVS's proposed landscaping buffer plan consisted of: (1) a tall arborvitae hedge to provide a complete visual screen between the Proposed Development and adjacent residential properties; (2) several arborvitaes to screen the opposite corner of the site; and (3) a mixture of spruce, fir, cedar, and cypress trees along the back area. Id. at 10. According to Soule, the proposed landscaping would create "an effective buffer between the [P]roposed [D]evelopment and the adjacent residential properties." Id.
When questioned about changes and additions to CVS's Master Plan II Application, Soule stated that "the parking lot has been moved and the buffer area has been increased; landscaping and green space has increased significantly." Id. at 11. As a result, "the proposed landscaping promotes high quality and appropriate design with an effective buffer[,] . . . provides significant amount of green space that goes beyond what is required by many cities[, and] goes above and beyond what was proposed in the previous application." Id. In her opinion, the proposed plan promotes "integration with the surrounding properties" and "effectively buffers the residential area . . . keeping with the City ordinance for landscaping along public streets." Id.
Todd Brayton (Brayton), a traffic expert, testified about the traffic study report submitted with the Master Plan II Application and previously submitted to and reviewed by the City Planner and their peer consultant, the Beta Group. Id. at 11-12. Brayton briefly explained the scope of the study area and the methodology used in his data collection and analysis. Id. While *Page 7 
Brayton acknowledged that substantial changes were made to the Proposed Development as part of the Master Plan II Application, he believed none of these changes affected his previous traffic analysis. Id. Therefore, according to his analyses, "traffic operation on the surrounding roadways and intersection will experience minimal change with the addition of the traffic generated by the proposed improvements; and no reduction in safety will occur due to the development as proposed." Id. at 12. In Brayton's expert opinion, "the proposed CVS development would not have a material, adverse impact on the flow of traffic in the surrounding area" and "would not have a material, adverse impact on the traffic safety in the surrounding area." Id.
Robert Medeiros (Medeiros), an architecture and construction consultant for CVS, testified as to material changes made in the Master Plan II Application. Medeiros explained that while the prior proposal for the CVS building was predominantly a brick facade building with some edifice accents, with the exception of the base surrounding the building's four sides, all the brick had been removed from the current building and replaced with clapboard siding trimmed with wooden raised panel elements, pilasters, signage facades, and edifices. Id. at 14. Additionally, the new proposal specified that the building height was reduced to a maximum of twenty-four feet. Id.
According to Medeiros, the newly proposed materials "are more typical for traditional, residential homes located in residential developments" and when combined with elements such as the trim and raised panels, will "introduce more of a residential feel in the window structures" and generally "give the building a residential scale, look and feel." Id. In his opinion, the material changes have been substantial, increasing the look and feel, and softening the building's façade. Id. at 14-15. *Page 8 
Gary McCoy (McCoy) testified about the proposed signage included in the Master Plan II Application. In McCoy's opinion, because the signage has been significantly reduced in size and in numbers, "a material change to the signage ha[d] occurred with the proposed project as contemplated to what was previously proposed."Id. In light of the reduction in number and size of the wall signage and free-standing signs, McCoy testified that there has been "a substantial reduction in overall signage," and as a result, "the proposed development . . . promotes high quality and appropriate design for this project." Id. at 15-16.
George Caldow (Caldow), a planning expert, testified that a substantial change occurred between the original and current master plan applications. Id. at 16. Caldow gave the Planning Board a brief summary of the proposed site and described the surrounding properties as follows:
 "[T]o the west of Dana Street is an older residential area, along Cass Avenue is a mix-use development, including several stores and several buildings that have commercial uses on the first floor and residential units on the second floor. Across Mendon Road is primarily institutional in that there is a church and several schools and several residential properties, all visible from the site." Id.
Caldow further explained that "the current zoning designation for the property is MU-1 from the corner of Mendon Road/Cass Avenue; to the north is R-2." Id. In his opinion, given that "a retail pharmacy is permitted in an [sic] MU-1 zone," the current proposal "does not introduce a new land use element to the general area" and a "rezoning is warranted to accommodate the proper development of the permitted uses." Id.
In addition, Caldow discussed the Proposed Development's consistency with the eight elements of the City's Comprehensive Plan and found that it was particularly consistent with the Land Use and Economic Development elements, among others. Id. at 16-17. Caldow also testified that the Proposed Development: (1) protects the health, safety, and welfare of the community; (2) integrates well with surrounding properties; (3) sufficiently addresses the MU-1 *Page 9 
residential scale and character requirements; (4) satisfies the Comprehensive Plan's reference to low-impact neighborhood commercial services; and (5) has been modified to conform to the requirements of the Comprehensive Plan. Id. 17-18.
Similarly, according to Caldow, the proposed zone change was supported by, and was in harmony with, the general purposes, standard, and provisions of the City's Zoning Ordinance and Subdivision and Land Development Regulations. Id. at 18-19. Indeed, Caldow testified that "the zoning change would improve the proposed future land use for this area of the City." Id.
Thomas Sweeney (Sweeney) testified as an expert in the field of real estate. Id. at 20. After giving a brief description of the site, Sweeney stated that in light of the landscaping buffers, the upgrade of Kay's parking lot, and the upgrade of the existing retail store to the proposed building, "the proposed development would not have an adverse impact on the surrounding properties, including the value of the nearby residential properties.Id. Indeed, Sweeney opined that the Proposed Development "would actually act as a benefit and buffer from the Mendon Road/Cass Avenue intersection to those properties located to the north and west[,] . . . provide an amenity both to the adjacent properties in the immediate area in general[, and] would essentially clean up this corner and provide a service to the immediate neighborhood." Id.
Furthermore, Sweeney explained that the intersection of Mendon Road and Cass Avenue is a mixed use intersection, and therefore he believed that "the proposed development would not alter the general character of the residential neighborhood." Id. Rather, based on the designs he reviewed, "the project integrates . . . into this type of neighborhood . . . and is appropriate for this neighborhood." Id. Finally, Sweeney stated that based on "the testimony he heard [that evening] and previously, his opinion is that [the Master Plan II Application] is a substantial change — the *Page 10 
design itself (especially the windows and reduction in signange) g[ave] the proposal a more residential feel as opposed to the previous plans." Id.
Upon the conclusion of Sweeney's testimony, the Planning Board, having found that substantial changes were made in CVS's Master Plan II Application, voted to deny Genereux's motion to dismiss based on administrative finality.[3] Thereafter, the Planning Board also voted to continue CVS's application until October 27, 2009.
When the Planning Board reconvened on October 27, 2009, Caldow was questioned about economic development and zoning. See October 27, 2010 Planning Board Meeting Minutes at 2-3. According to Caldow, in his experience, a development such as the one proposed not only "creates economic development," but "the pharmacy as it exists today, is . . . a permitted use by right in a MU-1 Zone."Id. at 3.
The Planning Board also heard testimony from Dino DeThomas (DeThomas), CVS's Senior Vice President of Real Estate Development. DeThomas testified that it is common practice for CVS to take antiquated, undersized buildings — not suitably located for today's consumer use — and re-locate those facilities to more convenient areas. Id. According to *Page 11 
DeThomas, with additional competition in the marketplace, "CVS is building the new store to remain competitive in the marketplace and protect and create additional jobs." Id. Indeed, DeThomas explained that the construction of the new store will not only create additional jobs for craftsmen, tradesmen, and construction workers, but additional employees would also be hired as a result of the increased volume at the Proposed Development. Id. In response to the concerns, DeThomas also reassured the Planning Board that the employees of two nearby CVS stores would keep their jobs, despite the closing of those locations. Id.
When questioned about whether CVS had considered a larger parcel for the new store, DeThomas stated that "CVS invests a considerable amount of work in site locations for its stores" and the "Cass Avenue/Mendon Road site is more than adequate for the proposed facility." Id. Furthermore, addressing the Planning Board's concerns over the residential character of the neighborhood, DeThomas emphasized that the area also contains, among other things, a barbershop, restaurants, convenience stores, offices, liquor stores, clothing store, and a doctor's office. Id. According to DeThomas, because people already traveled on either Mendon Road or Cass Avenue to get to the current Cass Avenue and Walnut Hill stores, it seemed logical to "locate a store in the middle of where people are traveling to make it easier for them." Id.
After the Planning Board opened the hearing to public comments, Genereux called Edward Pimentel (Pimentel), a planning and land use expert, to testify in opposition to the Proposed Development.Id. at 7-8. Pimentel began his testimony by addressing the type of use the Proposed Development should be classified as.Id. Pimentel explained that while a retail pharmacy is not an identified use under the City's Zoning Ordinance, it comes closest to retail sales. Id. at 8. According to Pimentel, after reviewing the use schedule in the definition section of the City's Zoning Ordinance, he believed the facility's use should be classified as a *Page 12 
supermarket, a use expressly precluded under the retail sales classification in a MU-1 zoning district.[4] Id. at 9-10. Additionally, Pimentel explained that due to the size and location of the Proposed Development, he believed it was clearly in conflict with the City's Comprehensive Plan and was not a low-impact neighborhood facility as articulated by the MU-1 classification.[5]
Following Pimentel's testimony, the Planning Board questioned Donald Gagnon (Gagnon), the City's Zoning Officer, and heard comments from the general public. When questioned as to whether the proposed CVS store was an acceptable use under the MU-1 zoning designation, Gagnon testified that based on his interpretation it was a permitted use. Id at 14. Gagnon indicated, however, that in addition to the zone change, CVS will need to obtain variances and design review approval to ensure compliance with the City's Comprehensive Plan, zoning ordinance, and land development regulations. Id. After hearing summation arguments by CVS and Genereux, a motion was made and approved to continue the hearing.Id. at 18-19. *Page 13 
 The Planning Board's review of CVS's Master Plan II Application
resumed on November 6, 2009. At that point the Planning Board
discussed their concerns — particularly with Proposed Development's
impact on the neighborhood and traffic — and then voted to approve:
(1) CVS's Master Plan II Application; (2) the proposed findings of
fact and decision with accompanying stipulations; and (3) a
recommendation to the City Council to approve the proposed zone
change. See November 6, 2010 Planning Board Meeting Minutes
at 10-12. On November 9, 2009, the Planning Board issued its decision
in connection with CVS's Master Plan II Application. Although the
Planning Board attached stipulations to its approval of CVS's Master
Plan II Application, based on its enumerated factual findings the
Planning Board concluded:
 "1. The proposed development is consistent with the City of Woonsocket Comprehensive Plan and is therefore approved. The application is approved because the proposed development satisfactorily achieves a residential scale and character as is envisioned for properties in the MU-1 zone and specifically along Mendon Road.
 "2. Provided that [CVS's] requested dimensional variances are granted by the Zoning Board, the proposed development is in compliance with the standards and provisions of the City of Woonsocket, RI Zoning Ordinance.
 "3. There will be no significant negative environmental impacts from the proposed development.
 "4. The proposed development will not result in the creation of individual lots with such physical constraints to development that building on those lots according to pertinent regulations and buildings standards would be impracticable.
 "5. All proposed lots will have adequate and permanent physical access to the public street." See November 9, 2009 Planning Board Decision at 5. *Page 14 
Thereafter, Genereux appealed the Planning Board's denial of his motion to dismiss and its approval of CVS's Master Plan II Application to the Board of Appeal. Although Genereux's appeal was originally scheduled to be heard by the Board of Appeal on November 23, 2009, it was not taken-up until December 7, 2009. At the hearing, Genereux submitted proposed findings of fact and requested that the Board of Appeal reverse the denial of his motion to dismiss based on administrative finality. See December 7, 2009 Board of Appeal Meeting Minutes at 1-3. In response, CVS submitted its own proposed findings of fact and argued that it had made substantial changes to its proposal before submitting a new application.Id. at 5. CVS further argued that the expert testimony before the Planning Board clearly indicated that substantial changes had been made to the Master Plan Application. Id. Specifically, CVS directed the Board of Appeal to review the testimony from Caldow, Medeiros, Soule, McCoy, and Matthews, all of which confirmed that CVS had made substantial changes in its Master Plan II Application and had addressed the Planning Board's prior concerns about the compatibility of the Proposed Development with the residential character of the neighborhood. Id. at 5-6. Following a brief recess, the Board of Appeal voted to approve CVS's proposed findings of fact and to deny Genereux's appeal as to the motion to dismiss. Id. at 8.
Next, the Board of Appeal addressed the Planning Board's approval of the Master Plan II Application. Id. Among the procedural and substantive errors argued by Appellant were the Planning Board's: (1) failure to make the appropriate findings; (2) failure to allow cross-examination; and (3) improper conclusion that the Master Plan II Application was consistent with the Comprehensive Plan and Zoning Ordinance. Id. at 8-10. In response, CVS addressed each of the Appellant's assertions and additionally contended that Appellant's appeal should be dismissed due to a procedural deficiency. Id. at 10-13. Following a recess, the Board of Appeal *Page 15 
voted to: (1) deny CVS's motion to dismiss Genereux's appeal for procedural deficiency; (2) uphold the Planning Board's decision granting CVS master plan approval; and (3) adopt the findings of fact as submitted by CVS. Id. at 14-16.
On December 21, 2009, Appellant appealed the Board of Appeal's decision to this Court. Appellant's complaint was amended on December 22, 2009 (C.A. No. 09-7297) and subsequently consolidated. In his amended complaint, Appellant requests that the Court: (1) issue a stay of the Board of Appeal's decision pending further proceedings; (2) reverse and overrule the decision; (3) enter judgment for Appellant as to this appeal; (4) award attorney's fees; and (5) award further relief as it may deem reasonable.
 Variances
On November 23, 2009, the Zoning Board heard CVS's application for certain dimensional variances tabled from November 9, 2009.See November 23, 2009 Zoning Board Meeting Minutes at 2. As part of its application, CVS sought dimensional variances from the (1) maximum gross floor area requirements of §§ 2.1-3 and 9.1-3; (2) minimum perimeter landscape buffers requirements of § 12.1-6.2; and (3) signage requirements of §§ 6.1-1.1(4), 6.1-4.6, 6.1-1.2, 6.1-4.10, and 6.1-1.1(1). Id.
After hearing testimony, the Zoning Board received proposed findings of fact from CVS and closed the public hearing.Id. The Zoning Board subsequently approved CVS's application with four stipulations[6] and accepted an amended version of CVS's proposed findings of fact. Id. at 6. The findings of fact indicate that the Zoning Board received the following testimony: (1) *Page 16 
Hogue as an expert in civil engineering; (2) Soule as an expert in landscape architecture; (3) Richard Poyant as an individual with thirty years of experience in signage; (4) DeThomas as Senior Vice President of Development for CVS; (5) Caldow as an expert in planning; and (6) Sweeney as an expert in real estate. Id.
at 4. Additionally, in connection with each of the variances granted, the Zoning Board made findings in accordance with § 45-24-41 of the Rhode Island Zoning Enabling Act of 1991 (Zoning Enabling Act) and § 15.7 of Woonsocket's Zoning Ordinance. Id. at 4-6.
On December 21, 2009, Appellant appealed the Zoning Board's decision to this Court (C.A. No. 09-7296) and subsequently amended his complaint on December 22, 2009. The amended complaint requests that the Court: (1) issue a stay of the Zoning Board's decision pending further proceedings; (2) reverse and overrule the decision; (3) enter judgment for Appellant as to this appeal; (4) award attorney's fees pursuant to G.L. 1956 § 42-92-1, et seq.; and (5) award further relief as it may deem reasonable.
 Zoning Change
In accordance with the Zoning Enabling Act, CVS sought to rezone a portion of the property located at the corner of Cass Avenue and Mendon Road from R-2 to MU-1. See G.L. 1956 § 45-24-51. In particular, CVS sought to amend the zoning designation of the following parcels: (1) assessor's plat 48 lot 79; (2) assessor's plat 48 lot 44; (3) assessor's plat 48 lot 45; and (4) a portion of assessor's plat 48 lot 12. See Ordinance 08-O-58 at 1.
On January 5, 2009, following the Planning Board's denial of CVS's Master Plan I Application, the City Council unanimously voted to defeat Ordinance 08-O-58 (Ordinance), which sought to amend the zoning parcels in contemplation of the Proposed Development.See January 5, 2009 City Council Meeting Minutes at 4. Subsequently, CVS sent Robert Iuliano *Page 17 
(Iuliano), Woonsocket's City Solicitor, a letter challenging the City Council's action at the January 5, 2009 meeting. See June 8, 2009 letter to Iuliano. In his letter to Iuliano, John Bolton (Bolton), counsel for CVS, stated:
 "On December 1, 2008, I attended a City Council meeting at which I requested that the subject Ordinance be withdrawn without prejudice. The City Council did not act on my request to withdraw the Ordinance but rather voted to table the matter. The hearing on the proposed Ordinance was tabled indefinitely and not continued to a date certain." Id.
Bolton further indicated that neither he nor his client received notification from the City that the Ordinance would be discussed at the January 5, 2009 meeting, and the Ordinance is not listed on the published agenda for the meeting. Id. As a result, Bolton alleged that the action taken with respect to the Ordinance at the January 5, 2009 was in violation of G.L. 1956 § 42-46-6(b) and had no legal force or effect. Id. Bolton requested that the City Council "acknowledge that the action it took with respect to the Ordinance" was void. Id.
On June 15, 2009, Iuliano informed the City Council of Bolton's allegation that it had removed the previously tabled Ordinance without providing notice to CVS in violation of Open Meetings Act.See June 15, 2009 letter to City Council. Iuliano advised the City Council to place the matter on the June 22, 2009 agenda and allow CVS to withdraw its request for a zoning change without prejudice. Id. On June 22, 2009, the City Council unanimously voted to table the Ordinance, but did not acknowledge the alleged violation. See June 22, 2009 City Council Meeting Minutes at 3.
On October 19, 2009, the Ordinance was removed from the table, ordered advertised for hearing on November 9, 2009, and returned to the table. See Ordinance 08-O-58 at 4. In accordance with § 45-24-52, Talbot provided the City Council with the Planning Board's recommendation regarding the Ordinance prior to the November 9, 2009 hearing. See *Page 18 
November 9, 2009 letter to City Council. Talbot indicated that the Planning Board "found that the proposed CVS Pharmacy project was generally consistent with the City's Comprehensive Plan" and had approved the Master Plan II Application. Id. Additionally, Talbot advised the City Council that the Planning Board, after seeking the advice of the Planning Department and reviewing each of the applicable purposes of zoning, had made the following finding:
 "The Planning Board finds that a proposed zone change from R-2 to MU-1 for lots 48-79, 48-44, 48-45, and a portion of lot 48-12 would be generally consistent with the City of Woonsocket Comprehensive Plan, including the Goals and Policies statements, the Implementation section, and all other applicable elements. Specifically, the Land Use Elements states that "Rezoning appropriate sections of land along Mendon Road to MU-1 is recommended to allow for low impact professional, office and commercial uses that will not conflict with the residential character of the street and will be in demand with the completion of Route 99." Id.
Subsequently, on November 9, 2009 and November 23, 2009, the City Council unanimously granted the Ordinance, and on November 30, 2009, Mayor Susan Menard approved and signed it. Id.
On December 21, 2009, Appellant filed a complaint with this Court challenging the City Council's approval of the Ordinance (C.A. No. 09-7295). Appellant subsequently amended his complaint on December 22, 2009 and requests that the Court: (1) stay the enforcement of the Amendment during the pendency of further proceedings in accordance with § 45-24-71(a); and (2) award such other relief as shall be deemed just.
Following hearings before this Court on September 21, 2010, September 22, 2010, and November 10, 2010, the Court entered the following order dismissing the matter:
 "The Court finds as a fact that the challenged zone change adopted by the Woonsocket City Council on November 9, 2009 and November 23, 2009 is clearly consistent with the Woonsocket 2010 Comprehensive Plan and hereby dismisses plaintiff's *Page 19 
challenge to such zone change in Ronald Genereux v. Thomas Bruce, et al., C.A. No. 09-7295." See Genereux v. Bruce, et al., C.A. No. 09-7295 (R.I., filed November 17, 2010) (Order).
 Administrative Subdivision
On January 7, 2010, the Administrative Officer of the Planning Board approved an Administrative Subdivision to merge Tax Assessor's Plat 48, Lot 44 with a portion of Lot 12 (Administrative Subdivision) under the provisions of § 45-23-37. See January 7, 2010 Planning Board Decision at 2-3. Although Genereux attempted to file an appeal of the Administrative Subdivision to the Board of Appeal, the appeal was untimely and not accepted.
On February 11, 2010, Appellant filed a verified complaint with this Court challenging the Administrative Subdivision (C.A. No. 10-0926).[7] Appellant's complaint requests that the Court: (1) grant judgment on his claims for declaratory judgment, injunctive relief, writ of mandamus, and equal access to justice; (2) enter judgment consistent with the claims made therein; (3) award reasonable attorney's fees and costs; and (4) grant such other and further relief as it deems just and appropriate. On March 26, 2010, Appellant filed a motion for preliminary injunction requesting that this Court order the Board of Appeal to accept the Appellant's appeal of the Administrative Subdivision approval. Said motion was denied on March 29, 2010.[8] *Page 20 
 Preliminary Plan Approval
Pursuant to §§ 45-23-39(b) and 45-23-41 of the Development Review Act, CVS submitted its original preliminary plan application (Preliminary Plan) to Talbot for review and approval by the Planning Board. See City of Woonsocket Subdivision and Land Development Regulations § 5.2. Following a review of the application by the planning staff, Talbot advised the Planning Board that the "[s]taff recommends the Planning Board approve the Preliminary Plan and grant a waiver of Section 6.3.1.26 of the City of Woonsocket Subdivision Ordinance." See February 2, 2010 Administrative Officer Report to the Planning Board at 2.
On February 2, 2010, the Planning Board considered CVS's Preliminary Plan. See February 2, 2010 Planning Board Meeting Minutes at 3. At the inception of CVS's presentation, Bolton stated that "much of what is called for during Preliminary Plan review has already been testified to and covered in detail with respect to the site plan, and traffic analysis report before this Board."Id. at 5. As a result, Bolton requested that all the testimony submitted during the Master Plan II Application review be incorporated by reference into the current proceedings and stated that he would focus any additional testimony to those issues or items that had changed since the Planning Board's master plan review. Id.
The Planning Board first heard expert testimony from Hogue. Hogue testified that following the Planning Board's approval of the Master Plan II Application, he submitted a revised plan to the City addressing the Planning Board's stipulations. Id. at 5-6. Additionally, in response to concerns from the Department of Public Works, the plan was again modified and submitted to the City on January 21, 2010. Id. In light of these modifications, explained Hogue, he requested and subsequently received a correspondence from the Department of Public Works *Page 21 
indicating that the revisions were acceptable and they were able to stamp the plans as approved. Id. at 6.
Hogue further testified that he had received comments from the Technical Review Committee which did not affect any changes to the site layout or site access and would be incorporated prior to final plan review. Id. In regard to permits, Hogue explained that they had received the necessary permits from the Department of Environmental Management, but were still awaiting the impending issuance of a permit from the Department of Transportation.Id.
The Planning Board next heard testimony from Brayton.Id. Brayton testified that he was unaware of any change in circumstances that would have modified the traffic analysis contained in the report previously submitted to the Planning Board during the master plan review hearings. Id. Brayton further addressed the Planning Board's previous concerns with the impact of the closing of two existing CVS stores when the Proposed Development was completed. Id. Summarizing his analysis and conclusions set forth in his January 5, 2010 memorandum, Brayton explained his methodology for concluding that the closing of the two CVS stores would not have a material adverse impact on the flow of traffic in the surrounding area. Id. at 7-8.
Finally, Caldow provided the Planning Board with testimony related to the Proposed Development's consistency with the Comprehensive Plan in light of the City Council's zone change approval, the Zoning Board's variance approval, and the Design Review Commission's design approval. Id. at 8. According to Caldow, the Proposed Development: (1) continues to satisfy the purposes set forth in § 1.2 of the City's Subdivision and Land Development Ordinance; (2) remains consistent with the City's Comprehensive Plan; and (3) continues to comply with the standards and provisions of the City's Zoning Ordinance. Id. at 9. *Page 22 
When questioned regarding CVS's request for a waiver from § 6.3.1.26 of the Subdivision Ordinance, [9] Caldow testified he was aware of several instances in which such a waiver was granted and that in his opinion, granting the waiver would be in the best interest of good planning practice.[10] Id. Caldow explained that the waiver is particularly appropriate given that the CVS will have to produce the required permits before being granted final plan approval. Id.
After the Planning Board opened the hearing to public comments, Genereux began his presentation opposing preliminary plan approval. Genereux's counsel, Kelly Nickson Morris (Morris), argued that CVS's application was currently incomplete and it would be improper under the circumstances to grant CVS's waiver request. Id. at 10-11. Subsequently, Joseph Casali (Casali), Genereux's engineering expert, testified as to a number of substantive issues related to site design. Id. at 12. In particular, Casali challenged CVS's expert testimony regarding: (1) drainage; (2) construction of a retaining wall to protect abutters; (2) lighting and sound levels; (3) location of mechanicals; (4) parking; (5) access to the Proposed Development; (6) snow removal; (7) fire access; and (8) soil evaluation. Id. at 15-19.
Following comments from the general public, Morris requested permission to present Paul Bannon (Bannon) as an expert witness in the field of traffic. Id. at 25. In view of the Planning Board's previous finding that the Proposed Development posed no significant adverse *Page 23 
impact on traffic, and Brayton's testimony that he was not aware of any change in circumstances that would modify his analysis and conclusions from the master plan review hearings, the Planning Board voted to not accept additional traffic testimony and to limit Bannon's testimony mainly to the Physical Alteration Permit.Id. at 25-27.
In connection with the Physical Alteration Permit, Bannon testified that based on the information previously provided to the Planning Board and his knowledge of the Department of Transportation's policies, it was his opinion that they would not approve the permit. Id. at 28. In particular, Bannon explained that he was unaware of the Department of Transportation ever approving a proposal such as CVS's, which would reduce the "green time" of the traffic signal at Cass Avenue to mitigate traffic issues at peak hours of the day. Id.
Next, the Planning Board heard testimony from Genereux regarding acoustics. Id. at 29. Genereux testified that Planning Board did not have sufficient evidence related to acoustics from which to base its findings. Id. at 30. Additionally, he explained that the materials submitted and the Proposed Development in its current form did not satisfactorily address the issue and thus, approval should not be granted.
After closing the public comment portion of the hearing, the Planning Board voted to: (1) grant CVS's requested waiver; (2) amend and accept the proposed findings of fact; and (3) grant CVS preliminary plan approval. Id. at 31-35. Although the Planning Board attached stipulations to its approval of CVS's Preliminary Plan application, based on its enumerated factual findings it concluded:
 "1. The proposed development is consistent with the City of Woonsocket Comprehensive Plan and is therefore approved. The application is approved because the proposed development satisfactorily achieves a residential scale and character as is envisioned for properties in the MU-1 zone and specifically along Mendon Road. *Page 24 
 2. With the dimensional variances granted by the Zoning Board of Review on November 23, 2009, the proposed development is in compliance with the standards and provisions of the City of Woonsocket, RI Zoning Ordinance.
 3. There will be no significant negative environmental impacts from the proposed development.
 4. The proposed development will not result in the creation of individual lots with such physical constraints to development that building on those lots according to pertinent regulations and buildings standards would be impracticable.
 5. All proposed lots will have adequate and permanent physical access to the public street." See February 2, 2010 Decision at 4.
Appellant appealed the Planning Board's decision to the Board of Appeal, which held hearings on March 22, 2010 and April 13, 2010. After tabling the appeal at the March 22, 2010 hearing, the Board of Appeal began the April 13, 2010 hearing with Morris's presentation.See April 13, 2010 Board of Appeal Meeting Minutes at 2. Morris argued, among other things, that the Planning Board had improperly: (1) granted CVS's waiver request; (2) refused to accept traffic testimony; (3) approved its findings of fact; (4) prohibited cross-examination; (5) determined that the Proposed Development and zone change were consistent with the Comprehensive Plan and Zoning Ordinance. Id. at 2-4.
In response, counsel for CVS reminded the Board of Appeal that as an appellate body, it was not to substitute its judgment for that of the Planning Board, but rather, to determine whether the record before the Planning Board supports its determinations. Id.
at 4. According to CVS's counsel, a review of the record reveals that the Planning Board: (1) did not commit procedural error; (2) properly granted a waiver; (3) conducted a fair hearing; and (4) made findings and conclusions sufficiently supported by the evidence before it. Id. at 4-6. *Page 25 
Following a recess, the Board of Appeal unanimously voted to deny Genereux's appeal in light of the arguments made by the opposing counsels and a consideration of the record before the Planning Board. Id. at 7. The Board of Appeal indicated that it "found no clear error in the record and no procedural error; and no lack of support for the decision in the record." Id.
On May 21, 2010, Appellant appealed the Board of Appeal's decision to this Court (C.A. No. 10-3045). In his complaint, Appellant requested that the Court: (1) reverse and overrule the Board of Appeal's decision; (2) enter judgment for Appellant as to this appeal; (4) award attorney's fees; and (5) award further relief as it may deem reasonable.
 Demolition Permits
On March 16, 2010, the City Building Official issued a Demolition Permit to demolish a garage/residential dwelling located on a portion of the Proposed Development. Although Genereux filed a motion for temporary restraining order (C.A. No. 10-0926) seeking to prevent the named parties from demolishing any additional structures, the dwelling had already been demolished and the matter became moot.[11]
 II Discussion A Res Judicata
As a threshold matter, CVS contends that Genereux's 2009 Complaints are precluded by res judicata. In sum and substance, CVS maintains that the 2009 Complaints are precluded because, on December 10, 2009, Genereux voluntarily dismissed, with prejudice, his November *Page 26 
18, 2009 amended verified complaint — seeking an injunction restraining the Planning Board, Zoning Board, and City Council from taking any further action until the Board of Appeal had resolved his appeal — rather than amending it to include the claims made in the 2009 Complaints.
"`Res judicata, or claim preclusion, prohibits the relitigation of all issues that were tried or might have been tried in the original suit. . . .'" Bossian v. Anderson, 991 A.2d 1025, 1027 (R.I. 2010) (quoting Carrozza v. Voccola, 962 A.2d 73, 78 (R.I. 2009)); see also DiBattista v. State,808 A.2d 1081, 1086 (R.I. 2002) (explaining that under res judicata, "a party defeated in one action may not maintain a later lawsuit based upon a ground that properly could have been asserted in the previous litigation"). "The policy underlying res judicata is to economize the court system's time and lessen its financial burden."ElGabri v. Lekas, 681 A.2d 271, 275 (R.I. 1996); seealso Gaudreau v. Blasbalg, 618 A.2d 1272, 1275 (R.I. 1993) (explaining that res judicata "ensures that judicial resources are not wasted on multiple and possibly inconsistent resolutions of the same lawsuit").
It is well settled that to serve as an absolute bar to a second cause of action, res judicata requires that there exist "`identity of parties, identity of issues, and finality of judgment in an earlier action.'" Palazzo v. Alves, 944 A.2d 144, 152 (R.I. 2008) (quoting Garganta v. Mobile Village, Inc., 730 A.2d 1,4-5 (R.I. 1999)). In determining the doctrine's preclusive effect on a second action, our Supreme Court adopted the Restatement's broad "transactional" approach. See DiBattista,808 A.2d at 1086; see also Lekas, 681 A.2d at 276
(establishing that Rhode Island's "res judicata interpretation exist[s] harmoniously with that of the Restatement (Second) Judgments"). The "transactional" approach "precludes the re-litigation of all or any part of the transaction, or series of connected transactions, out of which the [first] action arose." 1 *Page 27 
Restatement (Second) Judgments § 24 (1982); seealso DiBattista, 808 A.2d at 1086. The Restatement explains:
 "What factual grouping constitutes a `transaction,' and what groupings constitute a `series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations. . . ." Id.
Here, although the existence of identity of the parties is undisputed, [12] the parties do disagree as to whether sufficient identity of the issues exists. Identity of the issues requires the Court to examine whether a subsequent claim arises "from the same transaction or series of transactions which could have properly been raised in a previous litigation" or whether the actions are "`based on a common nucleus of operative facts.'" DiBattista,808 A.2d at 1086; Russo v. Baxter Healthcare Corp., 919 F. Supp. 565,569 (D.R.I. 1996) (citing Apparel Art Int'l, Inc. v. AmertexEnters. Ltd., 48 F.3d 576, 583 (1st Cir. 1995) (applying federal law of res judicata, which uses the same standards as Rhode Island law)). To determine whether the subsequent claims arise from a common nucleus of operative facts, the First Circuit directed courts to consider: (1) the nature of the injury for which the litigant seeks to recover; (2) whether the facts are related in time, space, origin or motivation; (3) whether the facts form a convenient trial unit; and (4) whether treating the facts as a unit conforms to the parties' expectations. See Apparel Art Int'l,48 F.3d at 584. *Page 28 
While the Court acknowledges that some of the facts forming the basis of Appellant's 2009 Complaints are referenced in his previously dismissed complaint, that alone is not enough to make them one cause of action. See Lawlor v. National Screen Serv.Corp., 349 U.S. 322, 328-29, 75 S. Ct. 865, 868-69 (1955) (explaining that the fact that a prior suit requested a preliminary injunction which, if granted, would have prevented the second suit from arising is not enough to make the two suits one cause of action). Moreover, the proceedings of the City Council and Zoning Board are entirely separate and distinct from any application pending before the Planning Board, and therefore, facts relevant to the presently challenged administrative actions are not common in time, space, origin, or motivation. Indeed, while Genereux's prior amended verified complaint sought solely to prevent the administrative proceedings from occurring, the instant matters challenge the administrative actions themselves.
Furthermore, even assuming the 2009 Complaints and previously dismissed complaint were based on the same claim, the Court finds that under the circumstances, the challenged appeals would nonetheless not be barred under res judicata. SeeRusso, 919 F. Supp. at 570-71 (noting that claims arising from events occurring after the filing of the original suit, but before the suit's resolution, are not barred by res judicata). InRusso, the United States District Court, applying Rhode Island law and civil procedure, held that a plaintiff is not required to supplement his original pleadings as a result of subsequent events and, therefore, claims based on the subsequent events cannot be barred by res judicata.[13] See 919 F. Supp. at 570-71
(reasoning that *Page 29 
"[s]ince all the circuit courts that have confronted this issue have refused to apply a res judicata bar to claims arising after the original lawsuit was filed, the Rhode Island courts would likely follow suit); see also Manning v. City ofAuburn, 953 F.2d 1355, 1360 (11th Cir. 1992) (affirming that where the filing of supplemental pleadings by a plaintiff is optional under the rules, res judicata does not make the filing of supplements mandatory).
Likewise, the Ninth Circuit explained that the "scope of litigation is framed by the complaint at the time it is filed."Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.,750 F.2d 731, 739-40 (9th Cir. 1984), cert. denied,474 U.S. 919, 106 S. Ct. 247 (1985). As a result, the Court held that "[t]he rule that a judgment is conclusive as to every matter that might have been litigated does not apply to new rights acquired pending the action which might have been, but which were not, required to be litigated," and thus, explicitly refused to impose a requirement "that every claim arising prior to entry of a final decree must be brought into the pending litigation or lost."Id.
Therefore, where, as here, Genereux was not required to supplement his original pleadings as a result of subsequent events, it follows that his actions based on those subsequent events cannot now be barred by res judicata. The Court finds that the preclusive effect of res judicata is limited to claims in existence at the time the original complaint was filed. Additionally, because Appellant's original complaint sought to stay further administrative proceedings related to the Proposed Development pending his appeal, while the current actions seek reversal or invalidation of the subsequent administrative actions, the Court finds it would be improper to impose res judicata where there is no risk of CVS being harassed by repetitive actions based on the same claim. See 1 Restatement (Second) Judgments § 26, comment a *Page 30 
(1982) (noting that the "main purpose of the general rule stated in § 24 is to protect the defendant from being harassed by repetitive actions based on the same claim").
 B Master Plan II Approval
On appeal, Genereux challenges the Board of Appeal's affirmation of the Planning Board's approval of CVS's Master Plan II Application and denial of his motion to dismiss on the basis of administrative finality. In particular, Genereux maintains that the Planning Board's decisions should be reversed because they were based on prejudicial procedural error, clear error, and are unsupported by the weight of the evidence on the record. CVS argues, however, that the Planning Board's findings and decision were properly affirmed by the Board of Appeal because they are not the result of prejudicial error and are substantially supported by legally competent evidence.
 1 Standard of Review
Under the Development Review Act, review of a planning board's decision is limited. See § 45-23-70. Indeed, when reviewing a decision of a planning board, "the board of appeal shall not substitute its own judgment for that of the planning board . . . but must consider the issue upon the findings and record of the planning board." Id. The Development Review Act states that "[t]he board of appeal shall reverse the lower body only if the zoning board finds that there was prejudicial procedural error, clear error, or a lack of support by the weight of the evidence in the record." Id.
The board of appeal, however, is not the final arbiter of a planning board decision. Pursuant to § 45-23-71, this Court is authorized to review decisions of the board of appeal. *Page 31 
While evaluating the board of appeal's actions, the Court is precluded from "substitut[ing] its judgment for that of the planning board as to the weight of the evidence on questions of fact." Rather, this Court may
 "affirm the decision of the board of appeal or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 "(1) In violation of constitutional, statutory, ordinance or planning board regulations provisions;
 "(2) In excess of the authority granted to the planning board by statute or ordinance;
 "(3) Made upon unlawful procedure;
 "(4) Affected by other error of law;
 "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 "(6) Arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Sec. 45-23-71(c).
Consequently, judicial review of a board of appeal's decision is not de novo, and it follows therefore, that a court should not "consider the credibility of witnesses, weigh the evidence, or make its own findings of fact."[14] See Munroe v. Town of E.Greenwich, 733 A.2d 703, 705 (R.I. 1999) (citing Kirby v.Planning Bd. of Review of Middletown, 634 A.2d 285, 290 (R.I. 1993)). *Page 32 
Instead, § 45-23-71(b), requires the Court to conduct a review of the proceedings and record before the planning board, "to ascertain whether the board's decision rests upon `competent evidence' or is affected by an error of law."[15] Id.; seealso Barrington Sch. Comm. v. Rhode Island State LaborRelations Bd., 608 A.2d 1126, 1138 (R.I. 1992) (acknowledging that when the Superior Court reviews the decisions of an administrative agency, it is limited to "an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision").
 2 Administrative Finality
Genereux argues that the Planning Board's finding that there were substantial changes to CVS's master plan application lacked evidentiary support, and therefore, the Board of Appeal's affirmation of the Planning Board's denial of his motion to dismiss based on administrative finality was clearly erroneous. Conversely, CVS maintains that the record before the Planning Board clearly supports its finding that the Master Plan II Application was substantially different than the previously denied application, and thus, this Court should affirm the actions of the Planning Board and Board of Appeal.
Under the doctrine of administrative finality, "when an administrative agency receives an application for relief and denies it, a subsequent application for the same relief may not be granted absent a showing of a change in material circumstances during the time between the two applications." Johnston Ambulatory SurgicalAssocs. v. Nolan, 755 A.2d 799, 808 (citing Audette v.Coletti, 539 A.2d 520, 521-22 (R.I. 1988)). The purpose of the doctrine is to promote *Page 33 
consistency in administrative decision-making, to prevent repetitive duplicative applications for the same relief, and to conserve the resources of administrative agencies and interested third parties that may intervene. Id. For that reason, our Supreme Court has determined that the rule is generally applicable to most areas of administrative regulation. See id. at 810; seealso Beechwood Enters., Inc. v. Charlestown Zoning Bd. ofReview, Nos. WC-2006-0717 2006-0581, 2008 R.I. Super. LEXIS 90, *38 (R.I. Super. Ct. July 31, 2008) (Thompson, J.) (emphasizing that a "review of our Supreme Court's cases dealing with the doctrine [of administrative finality]" indicates that it is one of general applicability and that it is especially well-established in the context of litigation surrounding questions of land-use").
Administrative finality "applies as long as the outcome sought in each application is substantially similar . . . even if the two applications each rely on different theories." Id. (citingCosta v. Gagnon, 455 A.2d 310, 313 (R.I. 1983); May-DayRealty Corp. v. Bd. of Appeals of Pawtucket, 107 R.I. 235, 237,267 A.2d 400, 401-02 (1970). Moreover, the doctrine is operative so long as the administrative agency's first decision was a valid final decision, and the relief sought in connection with the second application is "substantially similar" to the original application.See Johnston Ambulatory, 755 A.2d at 808-09.
To overcome the preclusive effect of administrative finality, an applicant must demonstrate or identify a substantial or material change in circumstances between the first and second application.Id. at 811. It is well settled that
 "[w]hat constitutes a material change will depend on the context of the particular administrative scheme and the relief sought by the applicant and should be determined with reference to the statutes, regulations, and case law that govern the specific field. The changed circumstances could be internal to the application, as when an applicant seeks the same relief but makes important changes in the application to address the concerns expressed in the denial of its earlier application. Or, external circumstances could *Page 34 
have changed, as when an applicant for a zoning exception demonstrates that the essential nature of land use in the immediate vicinity has changed since the previous application." Id.
In the instant matter, the Planning Board's October 20, 2009 decision indicated, inter alia, that "[a]fter listening to the applicant's expert witnesses, it is concluded that there have been substantial material changes to the proposed new application."See October 9, 2009 Planning Board Decision at 1. Furthermore, the Court is satisfied that the Planning Board's decision, and the Board of Appeal's affirmation of the same, was supported by legally competent evidence. Indeed, the record clearly reflects that the Planning Board received evidence and heard testimony from Caldow, Medeiros, Soule, McCoy, and Matthews which indicated that the changes made to the Master Plan II Application were "material" or "substantial" and addressed the Planning Board's prior concerns about the compatibility of the Proposed Development with the residential character of the neighborhood. See October 6, 2010 Planning Board Meeting Minutes.
Under the circumstances, it would be an abuse of discretion for this Court to independently review the evidence and reject the Planning Board's findings or the Board of Appeal's affirmation.See Johnston Ambulatory, 755 A.2d at 812 (asserting that a determination of whether circumstances have materially or substantially changed is to be made by the administrative decision-maker and "a trial justice would likely abuse his or her discretion by independently reviewing the evidence and rejecting the [decision-maker's] finding"). Consequently, the Court concludes that the actions and findings of the Planning Board — and the Board of Appeal's affirmation of the same — were proper in light of the competent evidence before it, and thus, CVS's Master Plan II Application is not barred by the doctrine of administrative finality. *Page 35 
 2 Right to Participate
Genereux further argues that the Planning Board prevented Genereux's meaningful participation in the hearing on the Master Plan II Application by refusing to allow cross examination of CVS's witnesses, CVS's representatives, and City staff present at the hearing, and as a result, has committed prejudicial error and abused its discretion. CVS maintains, however, that Genereux's assertions are clearly contradicted by the evidence contained in the record.
It is well settled in Rhode Island "that due process within administrative procedures requires the opportunity to be heard `at a meaningful time and in a meaningful manner.'" Millett v. HoistingEng'rs' Licensing Div. of Dep't of Labor, 119 R.I. 285, 296,377 A.2d 229, 235-36 (1977) (quoting Raper v. Lucey, 488 F.2d 748,753 (1st Cir. 1973)); see also Restivo v. Lynch,707 A.2d 663, 669-70 (R.I. 1998). Accordingly, under the General Laws, an administrative board such as a planning board, is merely required to "allow oral and written comments from the general public" during an information meeting. See § 45-23-40. Therefore, despite Genereux's contentions, the Planning Board was not statutorily required to provide an opportunity for cross-examination of CVS's witnesses and its representatives.
Moreover, the Court finds that Genereux and his counsel were provided with a meaningful opportunity to participate in the hearings before the Planning Board and Board of Appeal. Indeed, the record indicates the Planning Board merely deferred "cross-examinations until after the applicant ha[d] made his presentation," and that Genereux's counsel was informed that "if she should have questions for witnesses as opposed to a cross-examination, [she could] *Page 36 
present the questions to the Board for answer." See October 6, 2009 Planning Board Meeting Minutes at 4-5.
Likewise the Planning Board specifically provided that "[a]butters would have an opportunity to speak and make comment[s]," and the record is replete with evidence that Genereux and his counsel were provided an opportunity to advance his position through expert witness testimony and other evidentiary support. Seeid. at 4-5, 9, 20, 22-25; see also October 27, 2009 Planning Board Meeting Minutes at 4-10, 16, 18. Even the Planning Board's November 9, 2009 decision clearly indicates that it weighed the testimony of all the experts, including each party's planning experts, before concluding that the Proposed Development was consistent with the Comprehensive Plan. See November 9, 2009 Planning Board Decision at 4-5.
Consequently, while Genereux may be dissatisfied with the outcome of the proceedings, the Court is not persuaded that his right to participate was violated. Indeed, having determined that Genereux was provided with an "opportunity to be heard `at a meaningful time and in a meaningful manner,'" the Court heretofore rejects Appellant's contention that the Planning Board abused its discretion, and affirms the Board of Appeal's findings and conclusions in connection therewith. See Millett,119 R.I. at 296, 377 A.2d at 236 (quoting Raper, 488 F.2d at 753);Skelley v. Zoning Bd. of Review of South Kingstown,569 A.2d 1054, 1059 (R.I. 1990) (noting that in administrative process due process merely requires notice and an opportunity to be heard). *Page 37 
 3 Sufficiency of the Planning Board's Decision a Conformity with the Comprehensive Plan
At the crux of his appeal, Genereux asserts that the weight of the evidence before the Planning Board does not support its finding that the Proposed Development is consistent with the City's Comprehensive Plan, and therefore, its approval of CVS's Master Plan II Application and the Board of Appeal's affirmation thereof should be reversed. In contrast, CVS maintains that the Planning Board findings and conclusions were supported by legally competent evidence, and thus, the Court should uphold the Planning Board and Board of Appeal's actions.
In Rhode Island, the Comprehensive Planning and Land Use Regulation Act (Land Use Act) requires all municipalities to adopt, update, and amend a comprehensive plan. See
G.L. 1956 §§ 45-22.2-1 to 45-22.2-14. According to the Land Use Act, a "comprehensive plan is a statement (in texts, maps, illustrations, or other media of communication) that is designed to provide a basis for rational decision making regarding the long term development of the municipality" and "forms the basis of land use decisions to guide the overall physical, economic, and social development of the municipality." Sec. 45-22.2-6. "[A] comprehensive plan is not simply the innocuous general policy statement," but rather, it "establishes a binding framework or blueprint that dictates town and city promulgation of conforming planning ordinances." Town of E.Greenwich v. Narragansett Elec. Co., 651 A.2d 725, 727 (R.I. 1994). As a result, the Legislature requires that all subdivision or master plan proposals conform to a municipality's comprehensive plan. See § 45-23-60 (requiring a finding that "[t]he proposed development is *Page 38 
consistent with the comprehensive community plan and/or has satisfactorily addressed the issues where there may be inconsistencies").
Although Genereux avers that the Planning Board's decision to approve CVS's Master Plan II application was unsupported by the weight of the evidence and was affected by clear error of law, upon a review of the evidence before the Planning Board as well as its findings and conclusion, the Court simply does not agree. Here, the record indicates that Caldow testified to, among other things, that the: (1) proposal integrated well and did not introduce a new land use element to the general area because a pharmacy was a permitted use; (2) proposal was consistent with and had met the purpose and goals of the elements comprising the Comprehensive Plan, particularly the Land Use Element and Economic Development Element; (3) development would aid the City in fulfilling the need for neighborhood commercial services, improve the neighborhood itself, and protect the health, safety and welfare of the community; (4) Comprehensive Plan contemplated and sanctioned the rezoning of the Mendon Road corridor to a MU-1 zone; (5) applicant had addressed the Comprehensive Plan's references to MU-1 development maintaining a residential scale and character through design, reduction in size and signage, and an increase in buffage and landscaping; (6) the applicant had done everything in order to conform a legally permitted use — the stand-alone retail pharmacy — to the requirements contained in the City's Comprehensive Plan; and (7) the proposed zone change is consistent with the City's Comprehensive Plan and would improve the proposed future land use for this area of the City.
Furthermore, the Court would be remiss to ignore the clear mandates of the City's Comprehensive Plan. Here, the City's Comprehensive Plan plainly addressed the expansion of MU-1 zoning along Mendon Road. It states: *Page 39 
 "It is recommended that the City adopt a mixed-use zone designation for these areas, to more closely reflect the context of existing development. The proposed MU-1 zone will permit commercial uses, single-family and multi-family residential uses, and combinations of commercial and residential uses. . . . It is recommended [the MU-1 zoning designation] be applied to areas where mixed use currently exists, and is deemed acceptable, and to areas where mixed use is desirable for the future." 2008 Comprehensive Plan VIII-18-19.
As an example of where the MU-1 zoning designation should be applied, the Comprehensive Plan further states:
 "For instance, Mendon Road, a wide street and through route to the Diamond Hill Shopping District, will be experiencing greatly increased traffic volumes when Route 99 is completed. Most of Mendon Road is currently zoned residential. Rezoning appropriate sections of land along Mendon Road to MU-1 is recommended to allow for low impact professional, office and commercial uses that will not conflict with the residential character of the street and will be in demand with the completion of Route 99." Id.
Additionally, as part of the "Zoning Map Revisions," the Comprehensive Plan gives the general directive to "[r]ezone parcels to Residential/Commercial Mixed Use (MU-1) . . . as appropriate."Id. at VIII-31.[16] *Page 40 
While the Court acknowledges that the Appellant also introduced his own land use and planning expert, in the administrative appeal arena, it is not the province of this Court to substitute its own findings or judgments with respect to the creditability of the expert witnesses. See Munroe, 733 A.2d 703, 705;see also Mendosa v. Corey, 495 A.2d 257, 263 (R.I. 1985) (affirming that where there is conflicting evidence and expert testimony, the better rule is to limit the extent of judicial review because the board, which had before it the individual witnesses and had the opportunity to judge their credibility, is in a better position than the court to resolve the conflict). Here, the Planning Board's findings of fact clearly indicate that the "Board [ ] weighed the testimony of both planning experts and after weighing such testimony [found] the proposed zoning amendment to be consistent with the Comprehensive Plan." See November 9, 2009 Planning Board Decision at 4-5. Moreover, the Planning Board explicitly provided that "[b]ased on all expert testimony received, the Planning Board finds that the development is consistent with the City of Woonsocket Comprehensive Plan." Id.
Therefore, where, as here, the record indicates that the Planning Board was presented with expert witnesses — be they conflicting or not — and made findings of facts and conclusions based upon the same and the other competent evidence before it, the Court finds that the Planning Board's decision was supported by the record and not the result of error. Accordingly, the Court affirms the actions of both the Planning Board and the Board of Appeal. *Page 41 
 b Compliance with the Zoning Ordinance
Appellant further contends that the Planning Board's approval of CVS's Master Plan II Application should be reversed because proposed development is not in compliance with the standards and provisions of the City's Zoning Ordinance, and therefore, was erroneous and arbitrary and capricious. In particular, Genereux alleges that the development proposes a use that is not permitted within a MU-1 zoning district. CVS argues, however, that there was sufficient evidence in the record to support the Planning Board's finding related to zoning compliance and the Board of Appeal's affirmation of the same.
Under § 45-23-60, the Planning Board was required to make "positive findings" as to, among other things, the "proposed development [being] in compliance with the standards and provisions of the municipality's zoning ordinance." Sec. 45-23-60(a)(2). Here, upon a review of the record, it is clear to the Court that the Planning Board received testimony from witnesses, including Gagnon and Caldow, who testified that a stand-alone pharmacy is a permitted use in a MU-1 zoning district under the City's Zoning Ordinance.See October 6, 2009 Planning Board Meeting Minutes at 15; October 27, 2009 Planning Board Meeting Minutes at 10.
While the Court acknowledges that the Zoning Ordinance prohibits from a MU-1 district "an establishment engaged in the retail sale of food and/or groceries where the gross floor area of said establishment exceeds five thousand (5,000) square feet," the Planning Board was free to accept Caldow and Gagnon's testimony that the Proposed Development was a stand-alone pharmacy and a permitted use, and it is not within the purview of this Court to substitute that credibility determination. See Pawtucket TransferOperations, LLC v. City of Pawtucket, 944 A.2d 855, 859 (R.I. 2008) (quoting Monforte v. Zoning Bd. of Review of E.Providence, 93 R.I. 447, *Page 42 
449, 176 A.2d 726, 728 (1962)) (explaining that when the Superior Court reviews an administrative agency action, the Superior Court is precluded from substituting its judgment as to the weight of evidence on questions of fact because the agency is presumed to have knowledge concerning those matters which are related to an effective administration").
Moreover, although this Court conducts a de novo review of questions of law, where the question of whether the Proposed Development is a permitted use or falls within MU-1's "supermarket" exception is ambiguous, the construction adopted by the agency is entitled to weight and deference.[17] See PawtucketTransfer, 944 A.2d at 859-60 (R.I. 2008) (citing Flather v.Norberg, 119 R.I. 276, 283 n. 3, 377 A.2d 225, 229 n. 3 (1977) (acknowledging that while questions of law are reviewed de novo by the Superior Court, where provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency, or board, charged with its enforcement is entitled to weight and deference, as long as that construction is not clearly erroneous or unauthorized"). "This is true even when other reasonable constructions of the statute are possible."Id. at 860 (citing In re Lallo, 768 A.2d 921, 926 (R.I. 2001)).
Moreover, the record indicates that the Planning Board did not simply rubberstamp its review of the Master Plan II Application's compliance with the Zoning Ordinance. Rather, the Planning Board relied on the testimony proffered by the parties and conditioned its approval on CVS obtaining the necessary dimensional variances and the zoning change. See October 27, 2009 Planning Board Meeting Minutes at 14 (explaining that CVS will need to obtain zone *Page 43 
change, variance, and design approval to ensure compliance with the City's Comprehensive Plan); see also October 6, 2009 Planning Board Meeting Minutes at 17-18. The decision states:
 "Provided that the Applicant's requested dimensional variances are granted by the Zoning Board, the proposed development is in compliance with the standards and provisions of the City of Woonsocket, RI Zoning Ordinance." See
November 9, 2009 Planning Board Decision at 5.
In light of the foregoing, the Court finds that the Planning Board's determination that the Proposed Development complied with the standards and provisions of the Zoning Ordinance was neither clearly erroneous nor arbitrary and capricious. Consequently, the Court affirms the actions of both the Planning Board and Board of Appeal.
 C Zoning Board Variances
Genereux argues that the Zoning Board's November 23, 2009 decision approving CVS's dimensional variances should be reversed because it does not accurately characterize the hearing and the Zoning Board's findings of fact were prepared prior to the hearing. Conversely, CVS maintains that substantial evidence exists in the record to support the Zoning Board's decision and the record clearly indicates that the Zoning Board reviewed and modified the proposed findings of fact before determining that they accurately reflected the proceedings and accepting them.
 1 Standard of Review
Section 45-24-69 provides this Court with the specific authority to review decisions of town zoning boards. Under § 45-24-69(d), this Court has the power to affirm, reverse or remand a zoning board decision. In conducting its review, "[t]he court shall not substitute its judgment *Page 44 
for that of the zoning board of review as to the weight of the evidence on questions of fact." Sec. 45-24-69(d); seealso Curran v. Church Cmty. Hous. Corp., 672 A.2d 453,454 (R.I. 1996). This Court may reverse or modify the zoning board's decision
 "if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 "(1) In violation of constitutional, statutory, or ordinance provisions;
 "(2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 "(3) Made upon unlawful procedure;
 "(4) Affected by other error of law;
 "(5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 "(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Id.
The deference allotted to a zoning board's decision is due, in part, to the principle that "a zoning board of review is presumed to have knowledge concerning those matters which are related to an effective administration of the zoning ordinance." Cohen v. Duncan,970 A.2d 550, 561 (R.I. 2009) (quoting Monforte, 93 R.I. at 449,176 A.2d at 728).
It is axiomatic that in reviewing a decision of a zoning board of review, the trial justice "`must examine the entire record to determine whether substantial evidence exists to support the board's findings.'" Salve Regina College v. Zoning Bd. of Review ofNewport, 594 A.2d 878, 880 (R.I. 1991) (quoting DeStefano v.Zoning Bd. of Review of Warwick, 122 R.I. 241, 245,405 A.2d 1167, 1170 (1979)). The term "substantial evidence" has been defined as "`such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means [an] amount more than a scintilla but less than a preponderance.'" Lischio v. Zoning Bd.of *Page 45 Review of N. Kingstown, 818 A.2d 685, 690 n. 5 (R.I. 2003) (quoting Caswell v. George Sherman Sand Gravel Co.,424 A.2d 646, 647 (R.I. 1981)) (alteration in original). Simply put, a reviewing court may not substitute its judgment for that of a zoning board's, if the court "`can conscientiously find that the board's decision was supported by substantial evidence in the whole record.'" Mill Realty Assocs. v. Crowe, 841 A.2d 668, 672
(R.I. 2004) (quoting Apostolou v. Genovesi, 120 R.I. 501, 509,388 A.2d 821, 825 (1978)).
 2 Sufficiency of the Zoning Board's Decision
The Zoning Enabling Act provides that "[f]or any proceeding in which the right of appeal lies to the superior or supreme court, the zoning board of review shall have the minutes taken either by a competent stenographer or recorded by a sound-recording device."See § 45-24-61(a). It is well settled that this language does not compel a board to keep a formal or exact transcript of a proceeding, but rather, requires a board only to record the minutes of the meeting with sufficient detail to allow a reviewing court to ascertain the grounds of decision. See Holmes v.Dowling, 413 A.2d 95, 98 (R.I. 1980); Didonato v. Zoning Bd.of Review, 104 R.I. 158, 161, 242 A.2d 416, 418 (1968);Travers v. Zoning Bd. of Review of Bristol, 101 R.I. 510, 514,225 A.2d 222, 224 (1967). Here, Appellant contends that the failure to provide a tape or transcription of the November 23, 2009 hearing requires this Court to reverse or remand the Zoning Board's decision. However, the Court is not convinced that § 45-24-61(a) contains such a mandate.
Nevertheless, were this Court to conclude that such a requirement exists, the Zoning Board's mistake, if any, "went to form rather than substance and did not prejudice petitioners." Staller v.Cranston Zoning Bd. of Review, 100 R.I. 340, 341, 215 A.2d 418,419 (1965) (citing *Page 46 Taft v. Zoning Bd. of Review, 76 R.I. 443, 71 A.2d 886 (1950). Indeed, upon review, the record reveals that the minutes were taken by the Pauline Washington, the Zoning Board's Recording Secretary, and were written up in a decision form. See November 23, 2009 Zoning Board of Review Meeting Minutes. The Zoning Board's meeting minutes indicate: (1) the witnesses from whom testimony was received; (2) the subject areas of the testimony; (3) the Zoning Board's findings of facts and the factual basis for each finding; (4) the stipulations upon which approval was granted; (5) the vote of each Zoning Board member; (6) the reasons for approval; and (7) any modifications to the proposed findings of fact that were subsequently suggested and adopted. Therefore, in view of the thoroughness of the meeting minutes, this Court will not remand the case for new deliberations.
Moreover, with respect to each variance granted by the Zoning Board, the decision delineated each finding of fact necessary to satisfy the requirements of a dimensional variance, as well as the testimony which supported the Zoning Board's finding or conclusion.[18] See *Page 47 
November 23, 2009 Zoning Board of Review Meeting Minutes at 4-6. For that reason, the Court is satisfied that the findings of fact provide a sufficient basis for the denial. See Sciacca v.Caruso, 769 A.2d 578, 585 (R.I. 2001) (affirming that a zoning board's findings must be factual rather than conclusory and the application of legal principles must be something more than a mere recital of a litany).
Consequently, the Court finds that the Zoning Board's meeting minutes adequately document the Board's application of the factual findings to the legal standards promulgated by the State of Rhode Island and the City of Woonsocket for granting zoning relief. Accordingly, the Court finds that the Zoning Board complied with the requirements of § 45-24-61(a) and that the Zoning Board's decision to grant CVS's requested variances was proper in light of the substantial evidence before it.
 D Preliminary Plan[19]
Genereux alleges that the Planning Board's approval of CVS's Preliminary Plan should be reversed because: (1) the Planning Board's refusal to hear testimony during the February 2, 2010 hearing on CVS's Preliminary Plan application was a clear abuse of discretion; and (2) the *Page 48 
record does not support the finding that the Proposed Development is consistent with the Comprehensive Plan or complies with the standards and provisions of the zoning ordinance. Conversely, CVS maintains that the record not only indicates that the Planning Board allowed Appellant to submit testimony to support his opposition to CVS's Preliminary Plan, but also contains sufficient evidence to support the Planning Board's approval.
 1 Refusal to Hear Testimony
Despite Appellant's assertions, the Court finds that it was not an abuse of discretion for the Planning Board to refuse to accept additional traffic testimony and to limit Bannon's testimony "mainly to the Physical Alteration Permit." See February 2, 2010 Planning Board Meeting Minutes at 27. Indeed, the record and transcripts indicate that Appellant had ample opportunity to challenge CVS's traffic testimony prior to the Planning Board's November 9, 2009 decision.[20] See October 27, 2009 Planning Board Meeting Minutes at 17; November 6, *Page 49 
2009 Planning Board Meeting Minutes at 2. Moreover, in light of Brayton's testimony during the February 2, 2010 preliminary plan review hearing — that he was unaware of any change in circumstances that would have modified the traffic analysis contained in his previously submitted report — the Court finds the Planning Board's actions were reasonable. See February 2, 2010 Planning Board Meeting Minutes at 6.
Likewise, although the Planning Board may have limited the scope of testimony that was permitted during the February 2, 2010 hearing, Genereux's general assertion that the Planning Board refused to hear testimony proffered by its witnesses is overbroad and incorrect in light of the record before the Court. Rather, it is abundantly clear that Genereux and his counsel were provided with an appropriate opportunity to participate fully in the hearings. SeeMillett, 119 R.I. at 296, 377 A.2d at 235-36 (asserting that administrative procedures merely require an opportunity to be heard at a meaningful time and in a meaningful manner); seealso Restivo, 707 A.2d at 669-70; § 45-23-40 (stating that a planning board is merely required to "allow oral and written comments from the general public" during an informational meeting). Indeed, during the February 2, 2010 hearing, the Planning Board heard testimony from several of Appellant's witness, including: (1) Casali, who testified as to site plan issues such as drainage, construction of a retaining wall, lighting, mechanical equipment, snow removal, and other zoning and subdivision issues; and (2) Bannon, who testified about the Physical Alteration Permit. February 2, 2010 Woonsocket Planning Board Meeting Minutes at 14-19, 27-29.
Consequently, upon a review of the record in its totality, the Court finds that the Planning Board was acting within its discretion when it limited, and at times refused, certain testimony. Furthermore, the Court finds that both Genereux and CVS were afforded an opportunity to meaningfully participate in the hearings, and the Planning Board properly reached its *Page 50 
conclusions and made its credibility determination based on all the expert testimony received. Given the great deference afforded to the Planning Board and Board of Appeal, the Court finds that the Planning Board's actions were not a clear abuse of discretion and the Board of Appeal's affirmation was supported by competent evidence and not affected by an error of law.
 2 Sufficiency of the Planning Board's Decision
Similar to its appeal of the Planning Board's decision to approve CVS's Master Plan II Application, Genereux alleges that the Planning Board's decision to approve CVS's Preliminary Plan lacked evidentiary support, and thus, the Board of Appeal's affirmation of the same was clearly erroneous in view of the reliable, probative, and substantial evidence in the record. Specifically, Genereux contends that the evidence does not support the Planning Board's findings that the Proposed Development is consistent with the Comprehensive Plan or in compliance with the standards and provisions of the zoning ordinance.
The crux of Genereux's argument is that the Comprehensive Plan's future land use map does not show some of the site of the Proposed Development as being designated for mixed use, and therefore, the decision to approve the Preliminary Plan was inconsistent with the Comprehensive Plan and zoning ordinance. However, at the February 2, 2010 public hearing, Caldow submitted a revised report and testified that his analysis and conclusions originally provided during the Master Plan II review remained unchanged.[21] See February 2, *Page 51 
2010 Planning Board Meeting Minutes at 8-9. Caldow testified that his opinion regarding the Proposed Development's consistency with the City Comprehensive Plan remained unchanged particularly in light of the: (1) City Council's re-zoning of the parcels to MU-1; (2) the Zoning Board's granting of the requested variances that included gross floor area, signage, buffer area, retaining wall, and landscaping; and (3) Design Review Commission's determination that the Proposed Development's design was consistent with the residential scale and character requirements of the Zoning Ordinance and Comprehensive Plan. Id. Caldow further testified that in light of the foregoing, it was his expert opinion that the Proposed Development continued "to satisfy the purposes set forth in § 1.2 of the Subdivision and Land Development Ordinance" and "to comply with the standards and provisions of the City's Zoning Ordinance."Id.
Genereux also seems to allege that the Planning Board failed to make the appropriate findings required by § 45-23-60 and § 2.4 of the City's Subdivision and Land Development Ordinance. However, upon a review of the record, it is abundantly clear that the Planning Board had before it testimony from both the Master Plan review hearing, incorporated by reference, and the Preliminary Plan review hearing, and properly and adequately made findings of fact and conclusions from this evidence. The Planning Board's decision clearly describes the evidentiary basis for its findings and delineates each of the required findings specified by the Land Development Act and the City's Subdivision and Land Development Ordinance. See February 2, 2010 Planning Board Decision at 2-4.
Consequently, where, as here, the record indicates that Planning Board heard and accepted expert testimony substantiating the consistency of the Proposed Development with the *Page 52 
City's Comprehensive Plan and pertinent ordinances, the City Council had previously re-zoned the parcels from R-2 to MU-1, and the Planning Board made the appropriate findings of facts, the Court will not substitute its judgment for that of the Planning Board.See Munroe, 733 A.2d at 705 (citing Kirby,634 A.2d at 290) (affirming that a reviewing court should not "consider the credibility of witnesses, weigh the evidence, or make its own findings of fact," but rather should limit its review whether the board's decision rests upon competent evidence or is affected by an error of law); see also § 45-23-71(b) (stating that role of the Court is to review the record before the Planning Board and determine whether competent evidence existed to support its determinations). As a result, the Court concludes that the Planning Board's decision to approve the Preliminary Plan was not clearly erroneous and the Board of Appeal's affirmation of the same was proper.
 IV Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court finds that the Planning Board's decisions to grant master plan and preliminary plan approval were supported by competent evidence and not the result of clear abuse or error. Further, in view of the great deference afforded by this Court in administrative appeals, the Court upholds the Board of Appeal's affirmation of those decisions. Similarly, in light of the substantial and competent evidence in the record, the Court affirms the Zoning Board's decision to grant CVS's requested variances.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] Section 45-23-39(b) provides, in pertinent part, "[m]ajor plan review consist of three stages of review, master plan, preliminary plan and final plan. . . ." G.L. 1956 § 45-23-39(b).
[2] Notably, Talbot and her planning staff recommended that the Planning Board approve the Master Plan II Application and forward the project to the City Council for the required zone change.See October 6, 2009 Administrative Officer Report to the Planning Board at 2.
[3] On October 20, 2009, the Planning Board issued a decision concluding "that there have been substantial material changes to the proposed new application" and denying Genereux's motion to dismiss.See October 20, 2009 Decision of the Planning Board. On October 26, 2009, Genereux appealed the Planning Board's denial of his motion to dismiss to the Board of Appeal. Thereafter, on November 2, 2009, Appellant filed a verified complaint with this Court (C.A. No. 09-6328) seeking injunctive relief enjoining the Planning Board from "conducting further hearings relating to [CVS's] application for a major land development" until the Board of Appeal resolved Appellant's appeal. Following a hearing, this Court denied Genereux's request for injunctive relief, and a notice of appeal and motion for issuance of an injunction pending appeal were filed with the Supreme Court. On November 5, 2009, Appellant filed a petition for issuance of a writ of certiorari. The Supreme Court denied Appellant's motion and Genereux withdrew both his appeal to the Supreme Court and petition for writ of certiorari. On November 18, 2009, Appellant filed an amended verified complaint adding members of the Zoning Board and the City Council as defendants and simultaneously filed another motion seeking injunctive relief. On November 23, 2009, this Court denied Appellant's motion and on December 10, 2009, Appellant dismissed the amended verified complaint with prejudice.
[4] A "supermarket" is defined as "an establishment engaged in the retail sale of food and/or groceries where the gross floor area of said establishment exceeds 5,000 sq. ft." See Woonsocket's Zoning Ordinance § 18.1.
[5] A MU-1 zoning district is defined as:
 "Mixed Use Commercial/Residential District, primarily for the purpose of providing day-to-day convenient shopping needs, administrative and professional services, with an emphasis on daily necessities for the immediate residential area, provided that the gross floor area of each establishment shall not exceed three thousand (3,000) square feet, and the lot coverage shall not exceed thirty (30) percent. Minimum required lot area for both residential and nonresidential uses shall be six thousand (6,000) square feet for the first residential or nonresidential unit, plus four thousand (4,000) square feet for each additional residential or nonresidential unit on the same lot, with a maximum possible density of ten (10) dwelling units per acre." See
Woonsocket Zoning Ordinance § 2.1-3.
According to the Comprehensive Plan, "MU-1 zoning is recommended to allow for low impact professional, office and commercial uses that will not conflict with the residential character" of Mendon Road.See City of Woonsocket Comprehensive Plan § VIII-19.
[6] The Zoning Board's stipulations required: (1) strict compliance with plans and testimony as presented to the Zoning Board unless otherwise stipulated; (2) all deliveries to the store must be made between the hours of 7:00 a.m. and 7:00 p.m.; (3) all dumpsters must be emptied between the hours of 7:00 a.m. and 7:00 p.m.; and (4) any stipulations of approval placed by the Planning Board or City Council will be carried forward and apply to approval of CVS's variance application. See November 23, 2009 Zoning Board Meeting Minutes at 6.
[7] Appellant's complaints appealing the Board of Appeal's Master Plan II Application approval (C.A. No. 09-7297), the City Council's Ordinance approval (C.A. No. 09-7295), and the Zoning Board's variance approval (C.A. No. 09-7296) are hereinafter referred to as the "2009 Complaints."
[8] Upon a review of the material submitted to the Court, it is readily apparent that Appellant has failed to provide the Court with a meaningful discussion or legal briefing of the issues relevant to the Administrative Subdivision approval. As a result, the Court finds Appellant's failure to constitute a waiver of the issues and declines to address this aspect of the instant action. SeeTown of Coventry v. Baird Props., LLC, 13 A.3d 614, 619 (R.I. 2011) (quoting Wilkinson v. State Crime Lab. Comm'n,788 A.2d 1129, 1131 n. 1 (R.I. 2002)) (stating that "summarily listing issue for appellate review, `without meaningful discussion thereof or legal brief of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of the issue'"); see also James J. O'Rourke, Inc. v.Industrial Nat'l Bank of R.I., 478 A.2d 195, 198 (R.I. 1984) (noting that "[c]laims of error that are unsupported by either argument or citation of authority are entitled to no consideration on review").
[9] Section 6.3.1.26 requires that an applicant have obtained "[a]ll permits required by state or federal agencies prior to commencement of construction, including permits related to freshwater wetlands, floodplains, preliminary suitability for individual septic disposal systems, public water systems, and connections to state roads."
[10] Matthews similarly testified that "it has been commonplace at the Preliminary Plan Approval phase for the Board to grant conditional approvals subject to the receipt of those required state permit(s); and, that any modifications that are caused by the action of those state permit(s) — if they deviate from the plans that have been submitted/approved by the Planning Board, the applicant would be required to come back to the Planning Board." See February 2, 2010 Planning Board Meeting Minutes at 13.
[11] Notably, having failed to provide the Court with a meaningful discussion or legal briefing of the issues relevant to the Demolition Permit approval, the Court finds Appellant has waived the issues, and therefore, declines to address this aspect of the instant action. See supra note 8.
[12] "Identity of the parties" means that the parties in the current proceeding are identical to parties in the prior proceeding.Duffy v. Milder, 896 A.2d 27, 36 (R.I. 2006). Identity of parties may exist not only where the parties are the same, but also where privity exists between the parties to the current and prior proceedings. Id. Privity exists when "`there is a commonality of interest between the two entities and when they sufficiently represent each other's interests.'" Id. (quotingCommercial Union Ins. Co. v. Pelchat, 727 A.2d 676, 680 (R.I. 1999)).
[13] While the Court is mindful that a trial justice's conclusions are not binding on the case sub judice, it is also worth noting that in Belliveau Bldg. Corp. v. O'Coin, a trial justice of our Superior Court adopted the District Court's holding that held res judicata does not bar claims that arise after the original suit is lodged. See C.A. No. 90-2812, 1997 WL 839893, *5 (R.I. Super. Ct. February 19, 1997) (Gibney, J.). Indeed, the trial justice agreed with the holdings of the District Court and other federal circuits affirming that for res judicata purposes, "claims that `could have been brought' are claims in existence at the time the original complaint is filed or claims actually asserted by supplemental pleadings or otherwise in the earlier action."Id. (quoting Manning v. City of Auburn, 953 F.2d 1355,1360 (11th Cir. 1993)).
[14] Our Supreme Court has previously likened the two-step administrative appeals process to a funnel. SeeEnvironmental Scientific Corp. v. Durfee, 621 A.2d 200, 207-08
(R.I. 1993). At the first level, the Planning Board, similar to a hearing officer in a non land use forum, sits "as if at the mouth of the funnel" and analyzes all of the evidence, opinions, and issues.Id. at 207. Next, at the second level of review, the Board of Appeal, stationed at the "discharge end" of the funnel, does not receive the information considered by the Planning Board firsthand.Id. at 207-08. According to our Supreme Court, the "further away from the mouth of the funnel that an administrative official is . . . the more deference should be owed to the fact finder."Id. at 208. It follows, therefore, that a planning board, sitting at the "mouth of the funnel" is owed the greatest amount of deference with respect to its findings of fact.
[15] It is well settled that in the realm of administrative agency appeals, competent evidence is "any evidence that is not incompetent by reason of having no probative force as to the pertinent issue."Melucci v. Zoning Bd. of Review of Pawtucket, 101 R.I. 649,653, 226 A.2d 416, 419 (R.I. 1967).
[16] Notably, the 2010 Comprehensive Plan, adopted and revised as of September 15, 2010, also addresses revisions to and expansion of MU-1 zoning, particularly on Mendon Road. See
2010 Comprehensive Plan. The 2010 Comprehensive Plan expressly states that "regulations such as the maximum gross floor area allowed per establishment within the MU-1 zone . . . should be revisited, along with other regulations, to provide more realistic standards for today's commercial needs and to reduce the need for variances from the Zoning Board of Review. Id. at LU-15. In connection with future land use and zoning map changes, the 2010 Comprehensive Plan states:
 "Mendon Road: With the completion of Route 99, traffic volume has increased significantly along Mendon Road. The additional traffic makes these roadways less suitable for strict residential uses and more appropriate for mixed commercial uses. Additional amendments from Mixed Use to Major Commercial are recommended along Mendon Road. . . ." See 2010 Comprehensive Plan at LU-17.
Furthermore, the 2010 Comprehensive Plan specifically addresses the zoning designation for the site of the Proposed Development and indicates that the City's Zoning Map will be amended to reflect a zone change from low density residential to mixed use residential/commercial in the "areas near the intersection of Cass Ave and Mendon Road (approx. 1.46 acres)" in order to "[e]xpand[] commercial activity potential of Mendon Rd, an important corridor that connects Rte 99 with Diamond Hill Rd." Id. at LU-19. Accordingly, while it is not lost on the Court that an application for development is reviewed according to the regulations in force at the time the application was submitted, the Court nonetheless is of the opinion that the Proposed Development, in view of the foregoing, is clearly consistent with the 2010 Comprehensive Plan as well.See § 45-24-44(c).
[17] "It is well settled that `the rules of statutory construction apply equally to the construction of an ordinance.'" PawtucketTransfer, 944 A.2d at 859 (quoting Mongony v. Bevilacqua,432 A.2d 661, 663 (R.I. 1981)).
[18] A dimensional variance is defined as the "[p]ermission to depart from the dimensional requirements of a zoning ordinance, where the applicant for the requested relief has shown, by evidence upon the record, that there is no other reasonable alternative way to enjoy a legally permitted beneficial use of the subject property unless granted the requested relief from the dimensional regulations." Sec. 45-24-31(61)(ii). In order to grant a variance, an applicant must establish evidence of the following standards:
 "(1) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant, excepting those physical disabilities addressed in § 45-24-30(16); (2) That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain; (3) That the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of the zoning ordinance or the comprehensive plan upon which the ordinance is based; and (4) That the relief to be granted is the least relief necessary." Sec. 45-24-41(c).
In connection with an application for a dimensional variance, an applicant must also establish:
 "[T]hat the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted is not grounds for relief. The zoning board of review has the power to grant dimensional variances where the use is permitted by special use permit if provided for in the special use permit sections of the zoning ordinance." Sec. 45-24-41(d)(2).
[19] The Court's standard of review for an appeal from an administrative board's actions in connection with an application for preliminary plan approval has previously been articulated.See supra Section II(B)(1).
[20] As part of its November 9, 2009 decision, the Planning Board made the following pertinent findings:
 "8. The final conclusions of the applicant's revised traffic impact study stated that, `based on the analyses, traffic operations on the surrounding roadways and intersections will experience minimal change with the addition of the traffic generated by the proposed improvements. No reduction on safety will occur due to the development as proposed.' In its peer review, BETA Group did not disagree with these final findings of the applicants' traffic impact study and stated on the record that the findings of the applicant's revised traffic impact study `are conservative, (Bryant) has looked at the worst case scenario; they have addressed all of BETA's concerns.'
 "9. The Planning Board relies on the expert testimony of Applicant's traffic expert, which was not refuted with contrary expert testimony. The Planning Board finds that there are no material issues related to traffic impacts." See November 9, 2009 Planning Board Decision at 3.
[21] Notably, CVS's counsel requested that Caldow's prior testimony be incorporated by reference. See February 2, 2010 Woonsocket Planning Board Meeting Minutes at 8. In pertinent part, Caldow had previously testified, and his report indicated, that in his expert opinion: (1) the Comprehensive Plan clearly contemplated zone changes to the MU-1 zone along Mendon Road; (2) CVS had addressed the Comprehensive Plan's references to MU-1 development being in residential scale and character; (3) CVS had done everything necessary in order to conform a legally permitted use, a stand alone retail pharmacy, to the requirements contained in the City's Comprehensive Plan; and (4) that the Proposed Development is consistent with the standard and purposes of the City's Zoning and Subdivision Land Development Ordinances. See October 6, 2009 Woonsocket Planning Board Meeting Minutes at 17-19. *Page 1